1999 OK CR 38

Ernest Eugene PHILLIPS Jr., Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–97–695.

Court of Criminal Appeals of Oklahoma.

Oct. 15, 1999.

Rehearing Denied Dec. 14, 1999.

---

9. Appellant also raises this argument in Proposition 12.

Paul Faulk, Indigent Defense System, Norman, Jody Minter, III, Madill, James Thornley, District Attorney, Greg Jenkins, Assistant District Attorney, Durant, Counsel for the State at trial.

Cindy Brown Danner, Kristi L. Christopher, Indigent Defense System, Norman, Counsel for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Okla., William L. Humes, Assistant Attorney General, Oklahoma City, Counsel for the State on appeal.

### OPINION

LUMPKIN, Vice Presiding Judge:

¶ 1 Appellant Ernest Eugene Phillips, Jr., was tried by jury and convicted of First Degree Malice Aforethought Murder (21 O.S. 1991, § 701.7), Case No. CRF–96–284, in the District Court of Bryan County. The jury found the existence of two (2) aggravating circumstances and recommended the punishment of death. The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal.[1]

¶ 2 Appellant was convicted of the premeditated murder of seventeen (17) year old Jason McFail. On July 17, 1996, Brian Ezell and his parents traveled to Sherman, Texas, to pick up McFail so he could return with them to their home in Durant and visit for a few days. During the evening hours of July 19, Ezell and McFail ate dinner, visited with Ezell's parents and went to church. The young men then picked up Ezell's cousin, Shannon Hearn, and went to get gas for the car. On the way, they saw some friends of Ezell's parked at the Love's Country Store. Ezell drove over to the Love's and all three young men exited the car to visit with Davida Clark and Christina Chambers. As the young people visited, they heard Appellant shouting obscenities as he approached them. Appellant shouted "you niggers need to get your asses the hell out of town" and "run nigger run."

¶ 3 Appellant first approached McFail. McFail backed up, asked Appellant to leave him alone and said he was leaving the area. Appellant pushed McFail in the chest and onto Ezell's car. Appellant, still repeating the obscenities, next approached Ezell and pushed him up against Chambers' nearby car. Ezell got up and backed away from Appellant and in so doing observed a knife in Appellant's hand. Ezell walked around the corner to the nearby apartment of some friends to get help. When he returned he saw Appellant chasing Hearn. Ezell, who described Hearn as "kind of slow" mentally, shouted at him to run toward the apartment. Ezell escorted Hearn into the safety of the apartment.

---

1. Appellant's Petition in Error was filed in this Court on November 5, 1997. Appellant's brief was filed July 13, 1998. The State's brief was filed November 6, 1998. Appellant's reply brief was filed November 30, 1998. The case was submitted to the Court February 3, 1999. Oral argument was held August 17, 1999.

¶ 4 When Ezell returned to the scene, Appellant had entered the convenience store and asked for a light for his cigarette. He continued his reign of obscenities, directing them at the store clerks. One of the clerks told Appellant to leave and threatened to call the police. Appellant shouted "nigger lover" and lunged at the clerk. Appellant then turned around and left the store.

¶ 5 Meanwhile, McFail had approached Clark and said he thought he had been stabbed. When he lifted his shirt, blood poured from his chest each time his heart beat. He collapsed on Clark who laid him on the ground. McFail was conscious, but unable to speak. He could only look at Clark and cry. As Appellant left the convenience store, he walked past the gravely injured McFail lying on the ground and said "that's right nigger", "how do you like that you fucking nigger" and "feels good don't it."

¶ 6 The first police officers on the scene found McFail conscious and attempted to question him, but he could only gasp for air. While officers attempted to question McFail, he took a big breath and closed his eyes. Officers were unable to find a pulse. The ambulance arrived soon thereafter, but McFail never responded to any life saving procedures and became the victim of this horrific, senseless act of violence.

¶ 7 Upon leaving the convenience store, Appellant headed for a nearby bar. In talking with the bartender he asked her what she would do if she had done something really bad. Appellant then commented he would turn himself in to the police the next day. That next day, July 20, 1996, Appellant was arrested at his brother's home outside of Blue, Oklahoma. Once in custody, Appellant told police he had been working in Louisiana and had been in Durant only 3 or 4 days. He denied any involvement in the stabbing, stating he had been with friends at various bars the evening of July 19.

¶ 8 Appellant raises twenty (20) propositions of error in his appeal[2]. These propositions will be addressed in the order in which they arose at trial.

**2.** Appellant's brief lists twenty-one (21) propositions of error. However, the propositions were

### PRE-TRIAL ISSUES

¶ 9 Appellant contends in his tenth assignment of error the trial court erred in determining there was no doubt as to his competency to stand trial. Appellant argues sufficient evidence was presented to establish a doubt as to his competency and the trial court's failure to order a competency evaluation constituted structural error requiring reversal of his conviction.

¶ 10 In *Gilbert v. State*, 951 P.2d 98, 103–104 (Okl.Cr.1997), *cert. denied*, —— U.S. ——, 119 S.Ct. 207, 142 L.Ed.2d 170 (1998) we set forth the law regarding a defendant's competency to stand trial. We stated:

> An accused is presumed to be competent to stand trial and has the burden of proving his incompetence. *Bryson v. State*, 876 P.2d 240, 249 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995). If the defendant makes a threshold showing that he is incompetent by the filing of a proper application, the court must hold a hearing to examine the application. *Cargle v. State*, 909 P.2d 806, 815 (Okl.Cr.1995), *cert. denied*, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996). The test to be used at that hearing is whether the accused has sufficient ability to consult with his lawyer and has a rational as well as actual understanding of the proceedings against him. *Bryson*, 876 P.2d at 249. The determination of whether a sufficient doubt has been raised regarding a defendant's competency is left to the trial judge. *Id.* Such determination is based upon the particular facts and circumstances of each case. *Id.* The trial court is not required to give controlling effect to the opinions of experts, but may rely on the opinion of lay witnesses and the court's own observations of the defendant. *Id., Cooper v. State*, 889 P.2d 293, 304 (Okl.Cr.1995), *overruled on other grounds*, *Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996).

misnumbered and number 11 was omitted.

¶ 11 Addressing the term "doubt" (as used in both competency and sanity determinations), this Court relied on *Reynolds v. State*, 575 P.2d 628 (Okl.Cr.1978), as quoted in *Cargle v. State*, 909 P.2d 806, 815 (Okl.Cr. 1995), *cert. denied*, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996) and stated:

> It is well-settled in Oklahoma that the doubt referred to in the statute is that doubt which must arise in the mind of the trial court. The trial court may look to the source of the information and motive in determining whether there is doubt which would justify a sanity hearing, and the existence of a doubt as to defendant's sanity must arise from facts of a substantial nature. There must exist reasons to believe that the defendant's claim of insanity is genuine and not simulated to delay justice, and the finding of the trial court will not be disturbed on appeal unless a clear abuse of discretion is shown.

909 P.2d at 815.

¶ 12 Pursuant to 22 O.S.1991, § 1175.3, Appellant filed a Motion for Determination of Competency based upon the allegation a psychotic disorder had rendered him incompetent to assist counsel.[3] Attached to the application were affidavits from Dr. Philip Murphy and Dr. J.R. Smith who had examined Appellant in March 1997 and determined that he was not competent to stand trial because he was unable to assist counsel. At an April 11, 1997, hearing on Appellant's motion, it was stipulated that if the doctors were to testify they would testify consistent with their affidavits.

¶ 13 Appellant also presented the testimony of Karen Billing, an investigator with the Oklahoma Indigent Defense System (OIDS) and Michael Johns, a registered nurse and volunteer investigator at OIDS. Ms. Billing testified that in her capacity as an investigator she had visited with Appellant several times. She stated that during the first few visits "he seemed okay" and that his defense team believed he was compe-

tent to stand trial. However, as his case moved along through the court system and as he was pressed by his defense team for further information concerning the crime, communication with him became difficult and he became increasingly agitated. Ms. Billing stated that at a hearing held approximately one week earlier, Appellant "seemed to do okay during the hearing". However, during a recess in which defense counsel questioned Appellant about certain details of the offense, he became extremely agitated and was unable to concentrate and focus on the matter at hand. In her opinion, Appellant was "very psychotic" at the time. She testified that defense counsel had discussed a defense of second degree murder, but they felt that Appellant's inability to accurately recall facts of the murder prevented such a defense. She said Appellant understood the charges against him, but that he was hostile and belligerent towards defense counsel. She stated that sometime in March it was agreed that medication could help Appellant, but that she had been unsuccessful in her attempts to contact prison officials to make arrangements for Appellant to receive antipsychotic medication. On cross-examination, she admitted she was not a medical expert and could only give her personal opinion as to Appellant's psychotic condition. She said he was aware of what occurred the day of the homicide, but he was "not always aware of the whole context" and it was difficult to receive accurate information from him concerning events surrounding the murder.

¶ 14 Michael Johns testified he had a degree in nursing and had worked for ten (10) years in the field of psychiatry and mental health. He stated he had interviewed Appellant and reviewed reports from Drs. Murphy and Smith and concluded that Appellant had a serious thought process disorder and mental illness. He said that in an interview with Appellant where specific questions about the crime were asked, it was "hard to determine whether he refused to or couldn't" provide

---

**3.** The application for determination of competency discussed in this proposition of error was Appellant's second such motion. He had previously filed an application for determination of competency on September 5, 1996. (O.R.21). After a hearing on the motion, the trial court found a doubt had been raised as to Appellant's competency and Appellant was ordered committed to Eastern State Hospital. (O.R.23–24). A post-examination competency hearing was held November 6, 1996, at which time Appellant was found competent to stand trial. (O.R.33).

certain details because it was obvious he was thinking about something unrelated to the case. He opined Appellant exhibited symptoms of someone who is psychotic. Mr. Johns stated there was a Department of Corrections order specifically directing antipsychotic medication for Appellant, but that Appellant had not received such medication.

¶ 15 In addition to the above witnesses, defense counsel offered a statement as an officer of the court to the effect that Appellant had been belligerent and hostile towards counsel and refused to discuss his case. Counsel stated that as trial approached, Appellant became more belligerent and less cooperative.

¶ 16 The State presented the testimony of one witness, Fred Cook, Unit Manager, Oklahoma State Penitentiary. Mr. Cook testified to having daily contact with Appellant for approximately two (2) to three (3) months and described him as a typical inmate. He said Appellant had told him about his case and seemed to understand the charges against him. He noted that Appellant had commented that "they" were going to offer him life without parole but that he was not going to take it. Mr. Cook said that under DOC's contract with Bryan County, Appellant was to be held segregated from the general prison population. The only place available to hold him was a cell generally used for those inmates in protective custody.

¶ 17 During Cook's testimony, Appellant interrupted shouting obscenities and arguing it wasn't right for him to be placed in "PC". After Appellant was forcibly removed from the courtroom, Cook explained that inmates in protective custody were perceived as "snitches" by the general prison population. However, he had explained many times to Appellant that he was not in protective custody, he was merely being held in a cell usually used for protective custody inmates. Cook called Appellant's outburst typical of his behavior to "showboat", to get mad and act up when he did not get what he wanted. However, Cook said that was what the majority of the prison population did. Cook described Appellant as "conveniently crazy". He explained that when it was convenient for Appellant to act "crazy" he could, but then the

rest of the time, he would carry on conversations and function just like everyone else. Cook said that compared to other inmates he had seen in his twenty-three (23) years of working in the prison system, Appellant did not suffer from mental illness. On cross-examination, he testified he was not aware of any order for medication for Appellant.

¶ 18 After hearing the above evidence, the trial court ruled that it had not heard anything that convinced it that Appellant could not effectively and rationally assist counsel. The court found Appellant was able to distinguish right from wrong and was capable of communicating with counsel. Finding no doubt had been raised as to competency, Appellant's motion was overruled.

¶ 19 We find no error in the trial court's ruling. The evidence shows Appellant understood the nature of the charges against him and was able to assist counsel—if he so chose. The evidence indicates Appellant deliberately chose to become hostile and uncooperative with counsel. This is insufficient to raise a doubt as to his competency to stand trial. See Fox v. State, 524 P.2d 60, 65 (Okl.Cr.1974) ("It is not sufficient for the defense counsel merely to say that he is unable to communicate with his client; and, that his client's mental processes seem to waver while he is discussing the case with him; and, that his client does not understand the seriousness of a charge, to constitute justification for a finding that the defendant is mentally incompetent. In considering this question it is necessary that we consider the entire record."). See also Middaugh v. State, 767 P.2d 432, 434-35 (Okl.Cr.1988) (mere fact appellant had been treated for a mental condition in the past, had a heart condition, and had a nervous condition was not enough to raise a sufficient doubt as to his mental capacity to stand trial—especially in light of his testimony to the contrary); Siah v. State, 837 P.2d 485, 487 (Okl.Cr.1992) (lack of memory from substance abuse, trauma or a disease, does not create, per se, a lack of competence to stand trial).

¶ 20 Appellant's claims of incompetence are "general, speculative assertions which do not raise a doubt as to Appellant's ability to consult with counsel or understand the na-

ture of the proceedings against him." *Gilbert*, 951 P.2d at 105. The record clearly supports the trial court's finding, therefore such finding will not now be disturbed. This assignment of error is denied.

### PROSECUTORIAL MISCONDUCT DURING JURY SELECTION

██ ¶ 21 In his seventh assignment of error, Appellant argues the trial court erred in allowing the prosecutor to define "reasonable doubt" during *voir dire*. The record reflects that during *voir dire* the prosecutor asked a juror not to hold the State to any higher burden of proof such as "beyond all doubt" or "beyond a shadow of a doubt." Objections to the inquiries were overruled. The prosecutor further asked jurors if they would be able to forget any phrase they might have heard such as "beyond all doubt", "beyond any doubt", or "beyond a shadow of a doubt", "or anything else other than beyond a reasonable doubt."

¶ 22 Appellant is correct in his assertion that this Court has stated numerous times that reasonable doubt is self-explanatory, and therefore definitions thereof do not clarify the meaning of the phrase, but rather tend to confuse the jury. *Al–Mosawi v. State*, 929 P.2d 270, 279 (Okl.Cr.1996), *cert. denied*, 522 U.S. 852, 118 S.Ct. 145, 139 L.Ed.2d 92 (1997); *Templer v. State*, 494 P.2d 667, 671– 672 (Okl.Cr.1972). However, the comment in this case is comparable to the one upheld by this Court in *Hammon v. State*, 898 P.2d 1287, 1305 (Okl.Cr.1995). In *Hammon*, we reaffirmed our position that it was not error for prosecutors to state that reasonable doubt does not mean beyond any doubt or beyond a shadow of a doubt. *Id.* at 1305. We stated that when read in context such comments were "merely attempts by the prosecution to dispel commonly held attitudes rather than attempts to define reasonable doubt." *Id.*

¶ 23 Accordingly, we find the comment in the present case was not an impermissible attempt to define reasonable doubt but an attempt to dispel commonly held attitudes and often heard phrases. Finding no error, this assignment of error is denied.

### FIRST STAGE ISSUES

██ ¶ 24 In his second assignment of error, Appellant contends the evidence is insufficient to support his conviction for first degree malice aforethought murder. While he admits the State's evidence showed he inflicted a single stab wound to the victim's chest, Appellant argues these facts do not lead to the conclusion that he intended the victim's death. Appellant argues the standard to be used in reviewing the evidence is that which is used in cases of circumstantial evidence, that the evidence "simply did not exclude every reasonable hypothesis except that Mr. Phillips killed Jason McFail with malice aforethought." (Appellant's brief, pg. 32). He asserts the evidence, at best, raised nothing more than a suspicion or speculation of guilt.

██ ¶ 25 The evidence presented at trial consisted of both direct and circumstantial evidence, therefore we review the sufficiency of the evidence under the standard set forth in *Spuehler v. State*, 709 P.2d 202, 203–204 (Okl.Cr.1985); "whether, after reviewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the existence of the essential elements of the crime charged beyond a reasonable doubt."[4] This Court will accept all reasonable inferences and credibility choices that tend to support the verdict. *Washington v. State*, 729 P.2d 509, 510 (Okl.Cr.1986).

¶ 26 Title 21 O.S.1991, § 701.7(A) defines malice aforethought murder:

> A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being. **Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.** (emphasis added).

---

4. I continue to urge my colleagues to reject the unsupported dichotomy of tests relating to sufficiency of the evidence. *See White v. State*, 900 P.2d 982, 993–95 (Okl.Cr.1995) (Lumpkin, J. specially concurring). However, in this case the correct test is applied regardless of the method with which it is invoked.

¶ 27 "A design to effect death [i.e., premeditation] is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed." 21 O.S.1991, § 702. *See also Hooks v. State,* 862 P.2d 1273, 1280 (Okl.Cr.1993), *cert. denied,* 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994). Premeditation sufficient to constitute murder may be formed in an instant, *Boyd v. State,* 839 P.2d 1363, 1367 (Okl.Cr.1992), *cert. denied,* 509 U.S. 908, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993), or it may be formed instantaneously as the killing is being committed. *Allen v. State,* 821 P.2d 371, 374 (Okl.Cr.1991). Malice aforethought may be proved by circumstantial evidence. *Cavazos v. State,* 779 P.2d 987, 989 (Okl.Cr. 1989).

¶ 28 . Viewing the evidence in this case under the above law leads us to the "unmistakable conclusion that [Appellant] fully intended the consequences of his acts." *Allen,* 821 P.2d at 374. An obviously agitated Appellant approached the unarmed victim shouting obscenities and ignoring the victim's pleas to be left alone. Appellant stabbed the victim on the left side of his chest. Appellant walked over the fallen victim as he both entered and exited the convenience store. As he exited, Appellant was heard to say "that's right nigger", "how do you like that you fucking nigger" and "feels good don't it." If Appellant's words were more akin to "fighting words" as he argues, and he did not intend for anyone to die, then he could have stabbed the victim somewhere other than the heart. However, the uncontradicted evidence concerning the location of the victim's wound and Appellant's conduct toward the victim, both before and after the stabbing, clearly show he intended to kill the victim. Accordingly, we find the evidence sufficient to support the conviction for first degree malice aforethought murder. This proposition of error is denied.

¶ 29 In his fourth assignment of error, Appellant contends he was denied an opportunity to present a defense and to call witnesses when the trial court ruled he could not present evidence showing he was angry with his father at the time of the stabbing and therefore did not intend to kill the vic-

tim. Prior to trial, Appellant filed a notice of witnesses and summary of testimony indicating the defense would present, in part, evidence of Appellant's relationship with his father. In response, the State filed a Motion in Limine to prohibit the testimony arguing that such evidence was not relevant to the issue of Appellant's intent to kill. In a pretrial motion hearing, the defense argued that Appellant's father had physically and mentally abused him since his childhood, that Appellant had been living in Louisiana when he learned that his ex-wife and daughter were living with his father, that he feared his father would abuse his daughter just as he had Appellant, and that Appellant went to Durant to confront his father. The defense also argued that during the two or three days Appellant was in Durant, he was extremely upset, he drank quite a bit and threatened suicide. The defense argued the rage Appellant felt for his father, combined with his drinking and mental illness, caused him to pick a fight with the victim, though he did not intend to kill the victim. The State responded that such evidence was mitigation evidence to be presented in a second stage of trial, and not evidence relevant to Appellant's state of mind at the time of the crime. The trial court sustained the motion in *limine.*

¶ 30 The issue was again raised at trial after jury selection but before opening statements. The defense additionally argued that by the court's previous ruling, Appellant's ability to testify and explain why he was angry and intoxicated at the time of the stabbing was so severely limited as to render his testimony completely ineffectual. The defense argued that excluding such evidence would deny the jury the opportunity to see the entire picture of Appellant's state of mind at the time of the crime. The trial court upheld its previous ruling, finding the evidence was mitigating evidence appropriate only for the penalty phase of trial.

¶ 31 The issue was raised a third time during the defense case-in-chief. The trial court stood on its previous ruling and again excluded the evidence. With that ruling, the defense rested without presenting any witnesses. A detailed offer of proof was made concerning the witnesses and their testimony

relating to Appellant's relationship with his father and how that negated his intent to kill the victim.

¶ 32 Now on appeal, Appellant raises the same argument presented to the trial court: that his relationship with his father was relevant to proving his lack of intent to kill the victim. In support of his argument, Appellant cites case law stating that the defendant's state of mind at the time of the homicide is relevant. *See Jackson v. State*, 84 Okl.Cr. 138, 179 P.2d 924, 931 (1947); *Phelps v. State*, 64 Okl.Cr. 240, 248, 78 P.2d 1068, 1072 (1938).

¶ 33 In *Jackson*, this Court found evidence of the defendant's "whiskey drinking" and personal disputes with those other than the deceased was relevant to the defendant's state of mind at the time of the homicide. 179 P.2d at 930. However, these were incidents which occurred only hours before the homicide which the Court· found "[threw] light on the defendant's state of mind at the time of the shooting, and form[ed] a part of an unbroken chain of events leading up to and climaxing with the shooting of [the victim] by the defendant." *Id.*

¶ 34 In *Phelps*, the Court found relevant evidence that the appellant had assaulted a person unrelated to the victim of the homicide approximately three to four hours before the homicide. However, the reason the Court found the evidence relevant was due to the fact the weapon used in the assault (a blackjack) was the same type of weapon used in the homicide, and the appellant had denied having such a weapon.

¶ 35 These facts clearly distinguish *Jackson* and *Phelps* from the present case. Here, the evidence of the abuse suffered by Appellant at the hands of his father occurred approximately twenty (20) years before this homicide. It was not part of an "an unbroken chain of events leading up to and climaxing" with the stabbing of the victim as in *Jackson*. Further, there was no connection with the weapon used as in *Phelps*. Appellant's authority does not further his cause.

¶ 36 To the contrary, evidence of an appellant's ill will has been found relevant to his/her state of mind only in situations where

the ill will was directed toward the victim. *See Duvall v. State*, 825 P.2d 621, 626 (Okl. Cr.1991), *cert. denied*, 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992) ("[t]he relevance of testimony showing ill feeling, threats, or similar conduct by one spouse toward another in a marital homicide case has been established by this Court."); *Short v. State*, 980 P.2d 1081, 1097 (Okl.Cr.1999) (evidence of previous altercations between defendant and victim found relevant to defendant's intent in light of their close personal relationship).

¶ 37 In the present case, there is no question that Appellant and the victim were strangers to each other. As such, we fail to see how Appellant's abusive relationship with his father contributed to, or as Appellant argues "negates", his intent to kill the victim. In fact, Appellant could have been. angry with his father and still intended to kill the victim, if as he argues he perceived he was the object of derision by the victim and his acquaintances. Appellant does not argue that he did not know right from wrong or the consequences of his actions at the time he stabbed the victim. Evidence of Appellant's abusive past was not relevant to his state of mind toward the seventeen year old victim as it did not have any tendency to make more or less probable the fact that Appellant intended to kill the victim. *See* 12 O.S.1991, § 2401 (relevant evidence defined as "evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") Therefore, we find the trial court did not abuse its discretion in excluding the evidence.

¶ 38 However, this does not fully answer Appellant's claim. We must next consider whether the trial court's ruling denied Appellant the ability to present his defense. "The criminal defendant has the constitutional right to be heard at his trial. Okla. Const. art. II, § 20." *Harjo v. State*, 882 P.2d 1067, 1080 (Okl.Cr.1994), *cert. denied*, 514 U.S. 1131, 115 S.Ct. 2007, 131 L.Ed.2d 1007 (1995). *See also Rock v. Arkansas*, 483 U.S. 44, 49, 107 S.Ct. 2704, 2708, 97 L.Ed.2d 37 (1987). That right may be limited, but such limitation may not be arbi-

trary or disproportionate. *United States v. Scheffer*, 523 U.S. 303, 118 S.Ct. 1261, 1264, 140 L.Ed.2d 413 (1998). In the present case, Appellant was not prevented from testifying, he was only prevented from presenting evidence that was not relevant to an issue to be decided in the guilt phase of trial. Appellant still could have testified and described the events surrounding the stabbing. He was only prevented from detailing his abusive childhood. It was Appellant and not the trial court who deprived the jury of first hand testimony of the crime from the defense point of view. Exclusion of evidence of Appellant's abusive childhood did not prevent Appellant from presenting a defense. *See Scheffer*, 523 U.S. at 309, 118 S.Ct. at 1265 (defendant's case was not significantly impaired by the exclusion of unreliable polygraph evidence). Appellant made a strategic choice not to put on evidence in his defense. Therefore, we find Appellant was not denied his constitutional right to present a defense. This assignment of error is denied.

¶ 39 Appellant raises two challenges to the legality of his arrest in his eighth proposition of error. Appellant argues his arrest on a misdemeanor warrant for driving under suspension was a pretext and subterfuge for the purpose of gathering evidence about the homicide and that the warrant was not valid as to him. Initially, we note this allegation is reviewed for plain error only as this is the first time Appellant has challenged the legality of his arrest. A Motion to Suppress Accused In–Custody Statement was filed but challenged only Appellant's consent to speak to police and waiver of right to counsel. Moreover, Appellant pled not guilty to the charge against him at his arraignment without contesting the legality of the arrest. This Court has long held that failure to timely object to the legality of an arrest prior to entering a plea to the charges waives appellate review of the issue. *Clayton v. State*, 840 P.2d 18, 28 (Okl.Cr. 1992), *cert. denied*, 507 U.S. 1008, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993); *Holliday v. State*, 755 P.2d 124, 126 (Okl.Cr.1988). Consequently, we review only for plain error.

¶ 40 Appellant was arrested the day after the murder, July 20, 1996, at his brother's home in Blue, Oklahoma. Appellant was arrested upon an outstanding misdemeanor warrant for driving under suspension. Eight officers traveled to the home in Blue, but only two knocked at the door, and upon Appellant's invitation entered and served the warrant. Appellant was placed under arrest for driving under suspension. Appellant asked to get his wallet. At Appellant's direction, an officer retrieved the wallet. A knife laying next to the wallet was seized. Appellant was not questioned about the stabbing until he arrived at the police station at which time he was read his rights and interviewed.

¶ 41 The existence or nonexistence of subterfuge in effecting an arrest of an accused is a matter which is not established by any one independent factor but is established by the evidence surrounding the arrest considered in its entirety. *Alexander v. State*, 556 P.2d 1058, 1060 (Okl.Cr.1976) citing *Fields v. State*, 511 P.2d 1116, 1118 (Okl.Cr.1973). Whether a Fourth Amendment violation has occurred "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, ... and not on the officer's actual state of mind at the time the challenged action was taken". *Maryland v. Macon*, 472 U.S. 463, 470–471, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985) quoting *Scott v. United States*, 436 U.S. 128, 136–139, n. 13, 98 S.Ct. 1717, 1722, 1724, n. 13, 56 L.Ed.2d 168 (1978). *See also Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89, 98 (1996) (Supreme Court reiterated its position that it was unwilling to entertain Fourth Amendment challenges based upon the actual motivations of individual officers). *See also Lyons v. State*, 787 P.2d 460, 462 (Okl.Cr.1989) citing *Scott* and *United States v. Causey*, 818 F.2d 354, 358 (5th Cir.1987) (the subjective intent alone does not make otherwise lawful conduct illegal or unconstitutional).

¶ 42 Here, there is no evidence the bench warrant for driving under suspension was issued as a pretext for further investigation of the murder. The warrant was issued in 1995 and was a valid warrant at the time it was executed. Appellant directs us to testi-

mony showing officers knew about the bench warrant and had the opportunity to serve it and arrest Appellant prior to the murder. However, the arresting officer, Officer Timberlake, testified he did not know why the warrant was not served by one of the other officers prior to the murder. He stated that at the time he arrested Appellant, Appellant was only a suspect in the murder and that it was "logical" to serve the existing warrant at the same time.

¶ 43 Appellant further directs us to an Affidavit of Probable Cause to Make a Warrantless Arrest filed in the original record. The affidavit states Appellant was arrested July 20, 1996, at approx. 12:20 p.m. based upon probable cause as set forth in the affidavit. At trial, Officer Timberlake, the affiant on the affidavit, testified Appellant was not arrested upon probable cause but upon the municipal warrant. While no explanation was offered for the affidavit, we find any inconsistency in the affidavit and testimony did not render the warrant illegal. The officers legally executed a valid arrest warrant. Their subjective intent alone does not make this otherwise lawful conduct illegal or unconstitutional.

■ ¶ 44 Further, it is clear the warrant was not issued as a pretext for a search of the premises as officers entered only at Appellant's request. The knife was observed in plain view during the arrest and thus was not seized illegally. *See Reynolds v. State,* 575 P.2d 628, 634 (Okl.Cr.1978) (contraband in plain view seized during arrest was not considered a search). We find no plain error in the arrest or seizure of the knife.

■ ¶ 45 Challenging for the first time on appeal the validity of the underlying warrant, Appellant argues no efforts were made to verify the person listed in the warrant was him and not his father. The warrant was issued for Ernest Eugene Phillips at the address of Rt. 2, Box 499 in Durant, Oklahoma. Appellant is Ernest Eugene Phillips, Jr., and he was arrested outside of Blue, Oklahoma. Appellant directs us to *City of Tulsa v. Clifford,* 787 P.2d 1285, 1287–88 (Okl.Cr.1990) wherein we held that in cases where a doubt as to the correct identity of the subject of the warrant arises, the arrest-

ing officer should make immediate reasonable efforts to confirm or deny the applicability of the warrant to the detained individual. If, after such reasonable efforts, the officer reasonably and in good faith believes that the suspect is the one against whom the warrant is outstanding, a protective or administrative search incident to the arrest of that person is not in violation of the Fourth Amendment. *Id.* Here, the record contains no evidence of any doubt as to the identity of the person named on the warrant, therefore there was no need for officers to make any efforts to confirm or deny the applicability of the warrant to Appellant. Accordingly, this assignment of error is denied.

■ ¶ 46 In his ninth assignment of error, Appellant contends he was denied a fair trial by the admission of highly prejudicial and irrelevant evidence. Initially, he challenges the admission of a photograph of the victim's foot bearing a toe tag. Appellant's objection to the photograph was overruled. Appellant argues that in light of the medical examiner's identification of the body, the photo served no purpose other than to inflame the jury with the "chilling spectre of [the victim's] lifeless body laying on a cold, hard slab at the morgue." (Appellant's brief, pg. 63).

■ ¶ 47 The admissibility of photographs is a matter within the trial court's discretion and absent an abuse of that discretion, this Court will not reverse the trial court's ruling. *Patton v. State,* 973 P.2d 270, 290 (Okl.Cr.1998). Photographs are admissible if their content is relevant and their probative value is not substantially outweighed by their prejudicial effect. *Smith v. State,* 737 P.2d 1206, 1210 (Okl.Cr.1987), *cert. denied,* 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987); 12 O.S.1991, § 2403. The probative value of photographs of murder victims can be manifested in numerous ways, including showing the nature, extent and location of wounds, establishing the corpus delicti, depicting the crime scene, and corroborating the medical examiner's testimony. *Trice v. State,* 853 P.2d 203, 212–213 (Okl.Cr.), *cert. denied,* 510 U.S. 1025, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993).

¶ 48 In the present case, the photographs corroborated the medical examiner's testimony concerning the identity of the person autopsied. We have previously rejected the argument that photos are not relevant if the cause of death and the location of the wounds are not contested. *See Patton*, 973 P.2d at 290. *Hooks*, 862 P.2d at 1280–81. In every criminal prosecution, it is the State's responsibility to prove, first, the corpus delicti, and second, that the crime was committed by the accused. Pictures of the murder victim are always probative in establishing the corpus delicti of the crime. *Patton*, 973 P.2d at 290.

¶ 49 In reviewing the prejudicial impact of photographs this Court has said "where the probative value of photographs or slides is outweighed by their prejudicial impact on the jury that is, the evidence tends to elicit an emotional rather than rational judgment by the jury then they should not be admitted into evidence." *President v. State*, 602 P.2d 222, 225 (Okl.Cr.1979). *See also Short*, 980 P.2d at 1094, *Oxendine v. State*, 335 P.2d 940, 942 (Okl.Cr.1958). Applying that standard to this case, we find the photograph was not one to elicit solely an emotional response. The photograph shows only the victim's foot, with identifying toe tag and part of his leg. The victim's entire body is not visible. The photograph is neither gruesome nor inflammatory. The photograph was probative and that probative value was not outweighed by any prejudicial impact. Appellant has failed to meet his burden of prejudice, and we find no error in the admission of the photograph.

¶ 50 Appellant's next challenge is to the admissibility of a statement made to Officer Timberlake at the time of his arrest. After being placed under arrest for driving under suspension and read his rights, Appellant said "all these cops for a city warrant, you act like I killed somebody or something." Now on appeal, Appellant argues the statement was inadmissible hearsay lacking in any probative value. Appellant asserts the only purpose for presenting the statement was to raise the improper inference the he had lied to police by failing to confess or to explain the offense.

¶ 51 A defendant's own statements are not hearsay. *Workman v. State*, 824 P.2d 378, 382 (Okl.Cr.1991), *cert. denied*, 506 U.S. 890, 113 S.Ct. 258, 121 L.Ed.2d 189 (1992). *See also* 12 O.S.1991, § 2801(4)(b)(1). When a defendant's statements are relevant to the issues at trial, the trial court has the discretion to admit such. *Workman*, 824 P.2d at 382. Here, the record shows a voluntary statement made prior to any questioning by police. Appellant fails to cite any authority for his proposition that merely because a defendant's statement may not be the truth, this is grounds for excluding the statement. The statement was relevant as consistent with other statements made by Appellant denying his presence at the Love's store and any involvement in the crime. The relevance of this evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise. *See* 12 O.S.1991, § 2402. Therefore, it was properly admitted. This assignment of error is denied.

¶ 52 In his twentieth assignment of error, Appellant contends he was denied due process and the right to a fair trial when he was forced to wear a stunbelt during trial. Shortly before the jury was empanelled, defense counsel made a record that the State was forcing Appellant to wear a stunbelt while in the courtroom. Defense counsel admitted the belt was not readily noticeable by the jury, but voiced his objection to it being referred to in any manner or any way informing the jury about it. The trial court indicated that Appellant should not show it to the jury, but otherwise denied the objection.

¶ 53 In *Davis v. State*, 709 P.2d 207, 209 (Okl.Cr.1985), this Court reiterated the rule that no defendant shall be tried in handcuffs or shackles unless he waives his right. *See also* 22 O.S.1991, § 15. This Court noted the policy behind such a rule stating in part that a criminal defendant was entitled to appear in court with free use of his faculties, both mentally and physically citing *French v. State*, 377 P.2d 501 (Okl.Cr. 1962), *overruled by Peters v. State*, 516 P.2d 1372, 1374 (Okl.Cr.1973) (as to prior holdings

that it is reversible error to try the defendant while handcuffed). However, this right may be waived if the defendant engages in misconduct so disruptive and disrespectful that the trial cannot continue. *Peters,* 516 P.2d at 1374–75.

¶ 54 Although Section 15 does not directly address stunbelts, we find it applicable to physical restraints such as a stunbelt. Here, Appellant did not expressly waive his right to be tried free of physical restraints. However, his outbursts during the competency hearing, and evidence that he had committed acts of violence and created problems while incarcerated in both the Bryan County Jail and the Carter County Jail so that he was placed in the custody of the Department of Corrections made any statutory violation by the trial court harmless error. *See* 20 O.S.1991, § 3001.1 (statutory violations subject to harmless error analysis).

¶ 55 All parties agreed the stunbelt was not visible to the jury. There is no evidence the belt hampered Appellant's use of his hands, arms and legs or that it impaired his mental abilities. Therefore absent such evidence, we find any error did not deny Appellant a fair trial or have a "substantial influence" on the outcome of the trial. *See Simpson,* 876 P.2d at 702. This assignment of error is denied.

### FIRST STAGE JURY INSTRUCTIONS

¶ 56 Appellant contends in his first assignment of error the trial court erred by refusing to give his requested instructions on second degree murder as a lesser included offense. In *Willingham v. State,* 947 P.2d 1074, 1081 (Okl.Cr.1997), *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998) this Court held that second degree depraved mind murder is not a lesser included offense of first degree malice murder. Appellant recognizes *Willingham* but argues: 1) its application to his case would violate the *ex post facto* doctrine of the federal constitution, *U.S. Const.,* Art. I, §§ 9 and 10; and 2) the ruling in *Willingham* was legally incorrect and this Court should return to its prior rulings finding second degree depraved mind

murder is a lesser included offense of malice murder.

¶ 57 Although *Willingham* was handed down six (6) months after the trial in this case, the law upon which the decision that second degree depraved mind murder is not a lesser included offense of malice murder was based was the 1976 amendment to the statute. Therefore, as the statutory language upon which this Court relied for its authority was in effect at the time of the murder and trial in this case, it appears that no possible *ex post facto* violation is present. *See Castro v. State,* 749 P.2d 1146, 1150 (Okl.Cr.1987), *cert. denied,* 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988). Secondly, we reject Appellant's invitation to reconsider *Willingham* finding it a correct application of the law.

¶ 58 Appellant further argues he was entitled to an instruction on second degree depraved mind murder under case law which states that the trial court is to instruct on every degree of homicide which the evidence tends to prove. *Malone v. State,* 876 P.2d 707, 711 (Okl.Cr.1994); *Tarter v. State,* 359 P.2d 596, 601 (Okl.Cr.1961). A defendant is entitled to an instruction on every degree of homicide which is a lesser included offense of the primary charge and which is supported by the evidence. *See Rawlings v. State,* 740 P.2d 153, 160 (Okl.Cr. 1987); *Ross v. State,* 717 P.2d 117, 121–22 (Okl.Cr.1986) (the trial court should give an instruction on a lesser included offense only where the evidence would support such a theory). Here, second degree depraved mind murder was not a lesser included offense and the evidence did not support the giving of an instruction on second degree murder.

¶ 59 Murder in the second degree occurs "[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." 21 O.S.1991, § 701.8(1). We have held that this statute is applicable where there is no premeditated intent to kill any particular person. *Boyd,* 839 P.2d at 1367. Appellant argues that given the fact he stabbed the

victim, only once, with a small pocket knife, and that he did so while he was angry with his father, a reasonable juror could have found that his acts were imminently dangerous and evinced a depraved mind but were committed without the design to effect death. Appellant specifically relies on testimony by the medical examiner that the type of wound suffered by the victim was "survivable."

¶ 60 Appellant fails to note that the medical examiner testified that such a wound was survivable only if the victim got to a "chest surgeon quickly enough." As discussed in Proposition I, we find the evidence showed Appellant acted with the specific intent to effect the death of the victim. Therefore, the evidence does not support the giving of a jury instruction on second degree depraved mind murder, even if it were a lesser included offense.

¶ 61 Appellant further argues he was entitled to the second degree depraved mind murder instruction as it was his theory of defense. However, a defendant is only entitled to an instruction on a theory of defense if that theory is supported by the evidence and is tenable as a matter of law. *Kinsey v. State*, 798 P.2d 630, 632–33 (Okl.Cr.1990). If there is no evidence in the record to support an instruction, it should not be given. *Coulter v. State*, 721 P.2d 818, 819 (Okl.Cr.1986). As discussed above, the evidence did not support giving the instruction.

¶ 62 Finally, Appellant argues that by failing to instruct the jury on second degree murder, the trial court failed to provide the jury with the option of convicting him of a non-capital offense as required by *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). This same argument was raised and rejected in *Valdez v. State*, 900 P.2d 363, 378–379 (Okl.Cr.1995), *cert. denied*, 516 U.S. 967, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995) wherein we stated:

> Neither *Beck v. Alabama* nor *Schad v. Arizona* [501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991)] require that a jury in a capital case be given a third, non-capital option where the evidence absolutely does not support that option. The evidence in this case did not support a second degree murder instruction and the jury was thus

properly precluded from considering that particular non-capital option.

¶ 63 Similarly, the evidence in the present case did not support a second degree murder instruction. Therefore, for the reasons discussed above, we find the trial court did not err in omitting an instruction on second degree depraved mind murder. This assignment of error is denied.

¶ 64 In his third assignment of error, Appellant attacks the trial court's failure to give his requested instructions on voluntary intoxication and first degree manslaughter. In *Jackson v. State*, 964 P.2d 875, 892 (Okl.Cr.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999) we stated that an instruction on voluntary intoxication should be given "[w]hen sufficient, *prima facia* evidence is presented which meets the legal criteria for the defense of voluntary intoxication, . .". 964 P.2d at 892. The Court further stated:

> In clarifying this test, we now apply this test to the facts of this case. A defense of voluntary intoxication requires that a defendant, first, be intoxicated and, second, be so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent or special mental element of the crime. O.U.J.I. Cr.2d, 8–36 & 8–39 (1996).

*Id.* In applying this test in *Jackson*, the Court found the defendant failed to present evidence that his mental powers were so overcome through intoxication that he could not form the specific intent to kill. The evidence in the present case warrants a similar finding. Of the nine (9) eyewitnesses who testified, only two made any reference to the possibility that Appellant might be intoxicated. Brian Ezell testified on cross-examination that he smelled beer on Appellant's breath and that it seemed to him as if Appellant had been drinking. On re-direct examination, Ezell was asked if Appellant appeared to be intoxicated, to which he responded "I just smelled alcohol on his breath." On re-cross examination, Ezell agreed with counsel's statement "that basically a man with liquor on his breath, picked

a fight with ya'll for no reason?" Thomas O'Brian, the assistant manager at the Love's, testified on re-direct that Appellant did not appear intoxicated. He said he did not smell any alcohol on Appellant, that Appellant did not slur his speech, or have trouble walking. None of the other eyewitnesses smelled any alcohol on Appellant or opined that he was intoxicated. Additionally, Vicki Holliday, the bartender at the bar Appellant visited after the stabbing, testified that when Appellant came into the bar between 11:00 p.m. and midnight, he seemed calm, that she did not smell any alcohol on him and that he did not seem intoxicated.

¶ 65 None of the evidence showed that Appellant was actually intoxicated, therefore he failed to support the first element of his defense. Further, no evidence was presented, either directly through defense witnesses or indirectly through the State's witnesses, that Appellant was intoxicated to the extent his mental powers were overcome, rendering it impossible for him to form the specific criminal intent to kill. Accordingly, the trial court properly rejected an instruction on voluntary intoxication [5] and an accompanying instruction on first degree manslaughter [6]. This assignment of error is denied.

¶ 66 In his fifth assignment of error, Appellant argues reversible error occurred when the trial court refused his requested instruction that no adverse inference should be drawn from his failure to testify. In *Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 1119, 67 L.Ed.2d 241 (1981) the Supreme Court stated "the Fifth Amendment requires that a criminal trial judge must give a 'no-adverse-inference' jury instruction when requested by a defendant to do so." Any error in the omission of the requested instruction in this case is reviewed for plain error only as Appellant failed to raise a specific objection and inform the court of *Carter v. Kentucky*. It is the duty of counsel to aid the court in avoiding error

by raising specific objections at trial, thus giving the trial court the opportunity to correct any error. *See Driver v. State*, 634 P.2d 760, 763 (Okl.Cr.1981). Failure to object at trial when the error may be cured by the trial judge waives review for all but plain error. *Shelton v. State*, 793 P.2d 866, 871 (Okl.Cr.1990). Therefore, we review only for plain error.

¶ 67 The failure to give the requested instruction in this case was a constitutional error. *Carter v. Kentucky*, 450 U.S. at 300–01, 101 S.Ct. at 1119. However, this does not automatically require reversal as constitutional errors may be subject to a harmless error analysis. In considering whether such an error is subject to harmless error analysis, we must first determine whether it is a structural error or a trial error. *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991). The Supreme Court has differentiated between "trial error"—"error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt", *Id.* 499 U.S. at 307–08, 111 S.Ct. at 1264, and "structural error"—a "structural defect affecting the framework within which the trial proceeds" "which defy analysis by 'harmless-error' standards." *Id.* 499 U.S. at 310, 111 S.Ct. at 1265. *See also Bartell v. State*, 881 P.2d 92, 95 (Okl.Cr. 1994).

¶ 68 The failure to give Appellant's requested instruction is clearly an error in the trial process itself. This Court can "quantitatively assess[ ]" the "context of other evidence presented in order to determine whether [omission of the instruction] was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 307–08, 111 S.Ct. at 1264. Further, the constitutional privilege against compulsory self-incrimination which

---

**5.** *See Jackson,* 964 P.2d at 892.

**6.** Appellant makes no separate argument nor cites any cases supporting his claim to an instruction on first degree manslaughter. He merely raises it in the proposition heading and the first paragraph. It is well established this

Court will not search the record to support the appellant's unsupported assignments of error, nor review allegations of error which are not supported by legal authority. *Fuller v. State,* 751 P.2d 766, 768 (Okl.Cr.1988).

was infringed upon in this case is the same privilege involved in the very case in which the Supreme Court announced its harmless error standard. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).[7]

▉ ¶ 69 In conducting a harmless error analysis, we find the jury was instructed the defendant had pled not guilty and that no inference of guilt should arise merely because an Information was filed by the District Attorney, the defendant was presumed innocent, and that each element of the crime charged had to be proven beyond a reasonable doubt. No comments were made during presentation of the evidence or closing arguments regarding any inferences to be drawn from Appellant's failure to testify. Further, the evidence against Appellant was strong. Here, we find omission of the instruction harmless beyond a reasonable doubt as there is no reasonable possibility that the omission of the instruction might have contributed to the conviction. *See Poplin v. State,* 761 P.2d 905, 906–907 (Okl.Cr.1988) (failure to give requested instruction concerning no adverse inference from defendant's failure to testify subjected to harmless error analysis and found to be harmless in light of absence of any resulting prejudice). Accordingly, this assignment of error is denied.

▉ ¶ 70 In his sixth assignment of error, Appellant contends the first stage instructions misstated the law regarding the burden of proof and the presumption of innocence, and failed to adequately state the law encompassed in the general closing instructions provided by the uniform jury instructions. Appellant correctly notes the trial court did not use the Uniform Jury Instructions for criminal cases. Appellant's requested instructions based upon the uniform instructions were denied, to which a general objection was raised.

¶ 71 Instruction No. 1 stated:

To this charge the defendant has entered a plea of not guilty, which casts on the State the burden of proving the material allegations of the Information to your satisfaction, beyond a reasonable doubt, before you would be justified in returning a verdict of guilty.

The Information is simply the charge upon which the defendant is placed upon trial, and sets forth in a formal way the offense of which the defendant is accused, and it is, in and of itself, no evidence of the defendant's guilt, and you should not allow yourselves to be influenced against the defendant by reason of the filing of the information.

The defendant is presumed innocent of the crime charged against him and innocent of each and every material element constituting such offense, and this presumption of innocence continues until such time as his guilt is shown to your satisfaction beyond a reasonable doubt, and if upon consideration of all the evidence, facts and circumstances in the case you entertain a reasonable doubt of the guilt of the defendant of the crime charged against him, you must give him the benefit of that doubt and return a verdict of not guilt (sic).

¶ 72 Relying on *Flores v. State,* 896 P.2d 558, 560 (Okl.Cr.), *cert. denied,* 516 U.S. 1002, 116 S.Ct. 548, 133 L.Ed.2d 450 (1995), Appellant argues that giving the instruction which says the State is required to prove beyond a reasonable doubt "the material allegations of the Information", and that the defendant is presumed innocent of the crime charged against him and innocent of "each and every material element constituting such offense" is reversible error.

▉ ¶ 73 This Court stated in *Flores* the uniform jury instructions shall be used unless they do not accurately state the law. 896 P.2d at 560. "However, deviation from the uniform instructions does not require

---

7. In his Reply Brief, Appellant argues the error is not subject to a harmless error analysis citing to *Mack v. State,* 654 P.2d 1084 (Okl.Cr.1982) in which no harmless error analysis was conducted. In *Mack,* this Court merely reversed and remanded its prior decision in *Mack v. State,* 641 P.2d 1122 (Okl.Cr.1982), in light of *United States v.*

*Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982) which held *Carter v. Kentucky* was to be applied retroactively. As the issue of the retroactive application of *Carter v. Kentucky* is not present in this case, *Mack,* 654 P.2d 1084 is not applicable.

automatic reversal." *Id.* This Court reviews the instructions to determine whether the instruction at issue fairly and accurately states the applicable law. *Id.* "Even when error is committed, reversal is not required unless such error results in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right." *Id. See also* 20 O.S.1991, § 3001.1. Deviation from language of the uniform instructions constitutes technical error which is harmless if the instructions given fairly and accurately state the applicable law. *Smallwood v. State,* 763 P.2d 142, 144 (Okl.Cr.1988).

¶ 74 In *Flores,* we held that, in instructing the jury on the elements of the crime, the court should instruct the jury the prosecution must prove each element of the crime beyond a reasonable doubt, not that the prosecution must prove the material allegations of the crime beyond a reasonable doubt, observing the latter "may be confusing." *Id.* at 558. In this case, any confusion or error created by the reference to material allegations was cleared up by looking at the more specific Instruction No. 2 which set forth the elements of the offense of first degree malice murder. The jury was also instructed on the definition of "malice aforethought", what conduct is deemed culpable, and that if the State failed to prove "each element of the Murder in the First Degree beyond a reasonable doubt," the jury was to find the defendant not guilty. Reading these, and the rest of the instructions in their entirety, the State's burden to prove every element of the offense charged beyond a reasonable doubt is clear.

¶ 75 Appellant also argues the instruction allowed the jury to deduce the presumption of innocence did not apply to every element of the offense, but only to the elements it deemed material. We reject this characterization of the instructions. As discussed above, the specific elements of first degree malice murder were set forth in Instruction No. 2. Reading the instructions as a whole, particularly Instructions No. 1 and 2, it is clear the presumption of innocence continues until each element of the offense of first degree murder is proven beyond a reasonable doubt. Accordingly, we have no "grave doubts" that any error in Instruction No. 1

had a "substantial influence" on the outcome of the trial. *Simpson v. State,* 876 P.2d 690, 702 (Okl.Cr.1994). Therefore, any error is harmless and not grounds for reversal.

¶ 76 Appellant further argues that as a result of the trial court's failure to give the uniform jury instructions the jury was never instructed: 1) to limit its consideration to the evidence introduced during trial; 2) that it was restricted from considering any matter of fact or law except for that given to it while court was in session (OUJI–CR (2nd) 10–1); 3) its verdict must be based on the evidence (OUJI–CR (2nd) 10–2); 4) as to the definition of evidence (OUJI–CR (2nd) 10–5); and 5) to limit its speculation about objections (OUJI–CR (2nd) 10–9). Appellant asserts the failure to give the above listed uniform instructions left the jury with free rein to consider anything it chose, extraneous or not, in determining guilt or innocence. Appellant generally objected at trial to the omission of his requested uniform instructions.

¶ 77 A review of the instructions given to the jury shows the jury was instructed in Instruction No. 5 to "consider only the evidence introduced while the Court is in session", and as to the definition of "direct evidence" and "circumstantial evidence." Instruction No. 7 provided in part "[t]he Court has made rulings in the conduct of the trial and the admission of evidence. In so doing the Court has not expressed nor intimated in any way the weight or credit to be given any evidence or testimony admitted during the trial, nor indicated in any way the conclusions to be reached by you in this case." The jury was also instructed that it was to reach its conclusion based upon "the facts and circumstances appearing in evidence and coming to [your] observation during trial." Instruction No. 7 also provided "[t]hese instructions contain all the law, whether statute or otherwise, to be applied by you in this case, and the rules by which you are to weigh the evidence and determine the facts in issue."

¶ 78 While the instructions given to the jury were not the uniform instructions, they certainly did not give the jury "free rein to consider anything it chose." These instruc-

tions adequately guided the jury's consideration of the evidence and informed the jury that its verdict must be based on the evidence and law presented at trial. As such, any error in the trial court's failure to give the uniform instructions was harmless. *See Simpson*, 876 P.2d at 702.[8] Accordingly, this assignment of error is denied.

### SECOND STAGE ISSUES

 ¶ 79 In his thirteenth and fifteenth assignments of error, Appellant challenges the sufficiency of the evidence supporting the two aggravating circumstances found by the jury. "When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, the proper test is whether there was any competent evidence to support the State's charge that the aggravating circumstance existed." *Romano v. State*, 847 P.2d 368, 387 (Okl.Cr.1993), *aff'd, Romano v. Oklahoma*, 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). "In making this determination, this Court should view the evidence in the light most favorable to the State." *Id.*

 ¶ 80 The jury found the evidence sufficient to support the aggravator that the murder was especially heinous, atrocious, or cruel. This aggravator requires proof that the death was preceded by torture or serious physical abuse. *Revilla v. State*, 877 P.2d 1143, 1155 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995). This includes evidence which shows the infliction of either great physical anguish or extreme mental cruelty. *Hain v. State*, 919 P.2d 1130, 1146 (Okl.Cr.), *cert. denied*, 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996). After making the above determination, the attitude of the killer and the pitiless nature of the crime can also be considered. *Robinson v. State*, 900 P.2d 389, 402 (Okl.Cr.1995); *Revilla*, 877 P.2d at 1155.

¶ 81 This general rule of law is to be applied to the specific facts in each case.

However, it is those specific facts of each case which dictate the application of the aggravator. As this Court stated in *Robinson*, 900 P.2d at 401:

> As much as we would like to point to specific, uniform criteria, applicable to all murder cases, which would make the application of the "heinous, atrocious or cruel" aggravator a mechanical procedure, that is simply not possible. Rather, the examination of the facts of each and every case is necessary in determining whether the aggravator was proved. Unfortunately, no two cases present identical fact scenarios for our consideration, therefore the particulars of each case become the focus of our inquiry, as opposed to one case's similarity to another, in resolving a sufficiency of the evidence claim supporting the heinous, atrocious or cruel aggravator.

¶ 82 The evidence in the present case showed Appellant unexpectedly and without invitation approached the group of teenagers, shouting racial slurs and threats of harm. The victim pleaded with Appellant to leave him and his friends alone and was attempting to leave the scene when Appellant stabbed him in the chest. The victim, aware of his injury as blood poured from his chest with each heartbeat, sought assistance from one of his friends. Although he collapsed shortly thereafter, the evidence shows the victim was conscious for a period of time. As the victim lay on the ground bleeding and gasping for air, Appellant walked past him and said "that's right nigger", "how do you like that you fucking nigger" and "feels good don't it." Medical emergency personnel attempted to communicate with the conscious victim, but were unable to effectively do so because of the victim's inability to get enough breath to speak. Despite being unable to talk, tears flowed from the victim's eyes as he attempted to communicate.

¶ 83 Appellant's reliance on *Cudjo v. State*, 925 P.2d 895 (Okl.Cr.1996), *cert. de-*

---

8. However, this case presents a classic example of why trial judges should utilize the Uniform Jury Instructions—Criminal. Allegations of error on appeal can easily be avoided, rather than invited, through the judicious use of the uniform instructions during the trial of criminal cases.

Each judge in this State has been provided with copies of the uniform instructions, committee comments and notes on use. In addition to the hard copy and computer disk, the instructions are also available through the Court's web site.

*nied,* 519 U.S. 1126, 117 S.Ct. 981, 136 L.Ed.2d 863 (1997), is unavailing. In *Cudjo,* the victim surprised the defendant and as a result was shot once in the back of the head. While he was aware that he had been injured, the victim did not know the type of injury he had received. Although the victim saw the defendant with the gun immediately prior to the shooting, and asked the defendant not to shoot, there was no pursuit of the victim by the defendant nor any other actions directed toward the victim after the shooting. Further, the gravity of the victim's injury was not apparent to others at the scene as the victim talked in a coherent, sensible manner. As this Court said "the manner of [the] killing did not involve any acts of injury or cruelty beyond the scope of the act of killing itself." *Id.* at 901–02.

¶ 84 Considering the unprovoked manner of the killing in the present case; the conscious suffering of the victim, both physically and emotionally; the attitude of the killer as evidenced by Appellant's taunts and verbal threats, both before and after the stabbing; and the pitiless nature of this crime, we cannot say, construing the evidence in the light most favorable to the state, that the jury's finding of the heinous, atrocious or cruel aggravator was not supported by sufficient evidence.

¶ 85 Appellant further contends the evidence was insufficient to support the "continuing threat to society" aggravating circumstance. In order to support this aggravating circumstance, the State must demonstrate a defendant will continue to present a threat to society after sentencing. *Malone v. State,* 876 P.2d 707, 717 (Okl.Cr.1994). A defendant's criminal history, the callousness of the crime, threats against others, lack of remorse, and attempts to prevent calls to the police are all factors this Court has previously considered when addressing this issue. *Medlock v. State,* 887 P.2d 1333, 1349 (Okl. Cr.1994), *cert. denied,* 516 U.S. 918, 116 S.Ct. 310, 133 L.Ed.2d 213 (1995).

¶ 86 The State presented evidence of Appellant's criminal history in the form of prior convictions for second degree burglary, possession of stolen vehicle and escape from a penal institution. If this evidence was all that was offered in support of the aggravator, it would be insufficient. *See Torres v. State,* 962 P.2d 3, 23 (Okl.Cr.1998) ("[e]vidence of prior criminal acts must focus on only those crimes which indicate the likelihood of future violence."). Other evidence offered in support of this aggravator included testimony by Appellant's family members that they were afraid of him and needed the sheriff to evict Appellant from their house, and testimony that while in jail Appellant filled a spray bottle with urine and sprayed it on guards who were serving his food. This evidence shows a pattern of escalating criminal activity and general disregard for the rules of society which supports the jury's finding of the probability of future dangerousness which constitutes a continuing threat to society.

¶ 87 Appellant's own words and actions show the callousness with which this murder was committed. Appellant threatened to harm not only the teenagers outside the convenience store, but also the clerks inside the store. Further, the record is completely void of any sign of remorse by Appellant. This evidence of Appellant's attitude and actions showed he has a propensity to violence which makes him a continuing threat to society. *See Turrentine v. State,* 965 P.2d 955, 977–78 (Okl.Cr.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 624, 142 L.Ed.2d 562 (1998). Accordingly, this assignment of error is denied.

### SECOND STAGE JURY INSTRUCTIONS

¶ 88 In his fourteenth and sixteenth assignments of error, Appellant challenges the jury instructions on the above aggravators. In his fourteenth proposition of error, Appellant argues the jury was misinstructed as to the "especially heinous, atrocious, or cruel" aggravator when the court failed to include the term "physical" in the phrase "serious physical abuse" as required by OUJI–CR 2d 4–74. We review only for plain error as no specific objection to the instruction was raised at trial. *Turrentine,* 965 P.2d at 975.

¶ 89 In *Turrentine* we found this same deviation from the uniform instruction error. *Id.* "However, we are not persuaded that

the error lessened the standard of proof which the jury had to apply to find this aggravator... [t]he term "serious abuse" controls the standard of proof, and that term was given to the jury." *Id.* Further, "[t]he phrase 'serious abuse' as used in this context is commonly interpreted as referring to physical abuse." *Mollett v. State,* 939 P.2d 1, 14 (Okl.Cr.1997), *cert. denied,* 522 U.S. 1079, 118 S.Ct. 859, 139 L.Ed.2d 758 (1998). Here, the jury was instructed on the controlling term of "serious abuse." Further, the jury was never advised, either in instructions or the prosecution's closing argument, to emphasize any portion of the instruction over another. Therefore, we find the error harmless as it did not lessen the standard of proof and thus could have had no impact on the sentencing decision.

■■ ¶ 90 In his sixteenth assignment of error, Appellant contends the instruction on "continuing threat" failed to adequately instruct the jury that the State must prove beyond a reasonable doubt the probability that the defendant will commit future acts of violence. Appellant argues the probability of future violence is an element of the aggravator which is the "very essence of continuing threat". He contends the failure to instruct the jury to focus on the threat of future violence omitted an essential element of the aggravator from the jury's consideration.

■■ ¶ 91 Initially, we note the instruction given in this case was the uniform instruction, OUJI–CR (2d) 4–74. In *Ledbetter v. State,* 933 P.2d 880, 898 (Okl.Cr.1997), we addressed a challenge to an instruction on the "especially heinous, atrocious, or cruel" aggravator and stated:

> There are no "elements" as such: it is the aggravator itself which the prosecution had to prove to render Appellant eligible for the death penalty. It is the death penalty, not the individual aggravators, which the jury must find as the appropriate punishment for the defendant once the aggravator is proven....

*Id.* Likewise, we find the aggravator of "continuing threat" does not have elements. It is the aggravator itself which the prosecution has to prove, beyond a reasonable doubt, to render Appellant eligible for the death penalty. Appellant argues *Ledbetter* overlooks the fact that in drafting the new instruction on "continuing threat" the Oklahoma Uniform Jury Instruction Commission set forth elements of the aggravator.

¶ 92 The form of the uniform jury instruction does not list elements of the aggravator, but merely sets out the evidence necessary to support the aggravator. The instruction clearly informs the jury that the State has alleged there exists a probability that the defendant will commit future acts of violence that constitute a continuing threat to society. The jury was also instructed the State must prove that allegation beyond a reasonable doubt. The instruction given to the jury properly informed the jury of the State's burden to prove the aggravator and the evidence necessary to support the aggravator. *See Short,* 980 P.2d at 1103–04. Accordingly, this assignment of error is denied.

■■ ¶ 93 In his seventeenth assignment of error, Appellant contends the trial court erroneously instructed the jury on the burden of proof necessary to find the aggravating circumstances alleged in the Bill of Particulars. In particular, he complains the court instructed the jury that it must find the "material elements" of the aggravating circumstance before it could consider the death penalty. (O.R.609). Appellant argues the inclusion of the phrase "material elements" deprived him of the benefit of the presumption of innocence in the penalty phase of trial. He asserts that when the instruction is read in conjunction with those defining "continuing threat" and "especially heinous, atrocious or cruel" the jury was permitted to choose which elements it deemed material.

¶ 94 This argument is a continuation of the argument made in Proposition VI regarding the use of the term "material allegations" in the first stage instructions. As with the first stage instructions, the second stage instructions, when read in their entirety accurately state the appropriate burden of proof. In Instruction No. 3 the jury is instructed, in pertinent part, the defendant is "presumed innocent of the allegations made against him in the Bill of Particulars, ... and

this presumption continues until the State proves his guilt beyond a reasonable doubt." This instruction, read together with the more specific instructions addressing the evidence necessary to prove the alleged aggravating circumstances, adequately informed the jury of the presumption of innocence and the State's burden of proof. Therefore, the trial court's failure to give the appropriate uniform instruction was harmless error as it did not have a substantial influence on the outcome of the trial. *See Simpson,* 876 P.2d at 702. This assignment of error is denied.

### VICTIM IMPACT EVIDENCE

¶ 95 Appellant asserts in his eighteenth assignment of error the victim impact evidence violated his constitutional rights as it was centered exclusively on the emotional loss suffered by the witness and was speculative and inflammatory. Victim impact evidence is constitutionally acceptable unless "it is so unduly prejudicial that it renders the trial fundamentally unfair...." *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720, 735 (1991). In *Cargle,* 909 P.2d at 827–28, we set out the basis the United States Supreme Court utilized to find the Eighth Amendment is not violated by victim impact evidence and that the Fourteenth Amendment has the potential to be implicated if appropriate restrictions are not placed on victim impact evidence.

¶ 96 In *Cargle,* 909 P.2d. at 828, this Court stated:

The statutory language [22 O.S.Supp.1993, § 984] is clear the evidence should be restricted to the "financial, emotional, psychological, and physical effects," or impact, of the crime itself on the victim's survivors; as well as some personal characteristics of the victim. So long as these personal characteristics show how the loss of the victim will financially, emotionally, psychologically, or physically impact on those affected, it is relevant, as it gives the jury "a glimpse of the life" which a defendant "chose to extinguish," ... However, these personal characteristics should constitute a "quick" glimpse, and its use should be limited to showing how the victim's death is affecting or might affect the victim's survivors, and why the victim should not have been killed. (internal citations omitted).

¶ 97 In the present case, the State filed a Notice of Victim Impact Statement indicating its intent to call as a witness, Margie Osuji, the victim's mother. Prior to her testimony, Appellant objected on the grounds the evidence was unconstitutional and that the statement itself was improper as it was based entirely on the emotional impact of the witness's loss. Appellant also specifically objected to statements concerning the witness's dreams of seeing her son get his diploma and go to college. Appellant argued such statements were not relevant victim impact evidence. The court overruled the objections and allowed Mrs. Osuji to testify. She was the last witness called for the State in the penalty phase of trial and read a prepared statement for the jury which comprised two and quarter pages of the transcript.

¶ 98 Mrs. Osuji stated, in part, the victim was her only child and that she missed him very much. She said her son was a well-behaved, level headed young man who was very responsible and well liked by everyone who knew him. She testified how she would go to her son's room each day and lie on his bed and cry, and that some days she would cry throughout the day or in the "wee hours" of the morning longing to see her son. She stated that she dreaded the nights, and could not sleep well at night when she was home alone. She said she could not go to a convenience store at night without thinking of what had happened to her son. She also stated that Appellant had robbed her of seeing her son walk across the stage and get his high school diploma, of seeing her son go to his senior prom and to college and of being a grandmother. After this testimony, Appellant noted for the record the witness was visibly crying throughout the reading of the statement. The State admitted the witness was emotional but stated there were no emotional outbursts, that the witness "took good control of herself" and did not have to stop her testimony due to her emotions. Without comment, the trial court noted the State could call its next witness.

¶ 99 The victim impact evidence in this case comes very close to weighting the scales too far on the side of the prosecution by so intensely focusing on the emotional impact of the victim's loss. *Id.* at 826. However, as we stated in *Cargle,*

> In discussing this, we in no way hold the emotional impact of a victim's loss is irrelevant or inadmissible; we simply state that, in admitting evidence of emotional impact, especially to the exclusion of the other factors, a trial court runs a much greater risk of having its decision questioned on appeal. . . . The more a jury is exposed to the emotional aspects of a victim's death, the less likely their verdict will be a "reasoned moral response" to the question whether a defendant deserves to die; and the greater the risk a defendant will be deprived of Due Process. (citations omitted).

909 P.2d at 830.

■ ¶ 100 Mrs. Osuji's statements concerning crying for her son, her inability to sleep and go to convenience stores were probative of the emotional, psychological, and physical effects she experienced as a result of the murder of her only child. The descriptions of her son's personality provided a brief glimpse of the unique characteristics of the individual known as Jason McFail. While her statements concerning her desires for her son's future were speculative and may not have been relevant victim impact evidence, their admission did not prevent the jury from fulfilling its function in the second stage of trial. *See Short,* 980 P.2d at 1100. While a portion of the victim impact testimony was very emotional, taken as a whole, the testimony was within the bounds of admissible evidence, and its focus on emotion did not have such a prejudicial effect or so skew the presentation as to divert the jury from its duty to reach a reasoned moral decision on whether to impose the death penalty. *Id.* Accordingly, this assignment of error is denied.

### INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

¶ 101 In his nineteenth assignment of error, Appellant asserts he was denied the effective assistance of counsel by counsel's failure to adequately: 1) challenge the arrest and move to suppress the evidence seized as a result; and 2) investigate and present evidence that Appellant was not a racist.

¶ 102 An analysis of an ineffective assistance of counsel claim begins with the presumption that trial counsel was competent to provide the guiding hand that the accused needed, and therefore the burden is on the accused to demonstrate both a deficient performance and resulting prejudice. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *Strickland* sets forth the two-part test which must be applied to determine whether a defendant has been denied effective assistance of counsel. First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense. Unless the defendant makes both showings, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 104 S.Ct. at 2064. Appellant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. *Id.* at 688–89, 104 S.Ct. at 2065.

■ ¶ 103 When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. *Id.* at 697, 104 S.Ct. at 2069. Concerning the prejudice prong, the Supreme Court, in interpreting *Strickland,* has held:

> [An appellant] alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S., at 687, 104 S.Ct., at 2064; *see also Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect"); *Nix v. Whiteside,*

supra, 475 U.S. 157, at 175, 106 S.Ct. 988, at 998, 89 L.Ed.2d 123 (1986). Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him. *See United States v. Cronic,* supra, 466 U.S. 648, at 658, 104 S.Ct. 2039, at 2046, 80 L.Ed.2d 657 (1984). *Lockhart v. Fretwell,* 506 U.S. 364, 369–70, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180, 189 (1993) (footnote omitted). Although we must consider the totality of the evidence which was before the factfinder, our "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069; *Fisher v. State,* 736 P.2d 1003, 1012 (Okl.Cr.1987).

¶ 104 Appellant's claim regarding counsel's failure to challenge the arrest can be disposed of based upon a lack of prejudice. While the failure to object may rise to the level of ineffective assistance of counsel, such a failure often will not be conclusive. Where objections that might have been raised would have been properly overruled and those that might have been sustained would have amounted to at most harmless error had the ruling been incorrect, Appellant has failed to show that any errors by counsel were so great as to render the results of the trial unreliable. *Short,* 980 P.2d at 1102. Here, the arrest and seizure of the knife were legal, therefore Appellant was not prejudiced by counsel's failure to raise an objection.

¶ 105 Next, Appellant complains that counsel failed to present evidence of his lack of racial animosity. However, in his appellate brief, Appellant fails to set forth what evidence on the subject could have been presented. Appellant argues that counsel's direct examination of his (Appellant's) half-brother Roy Cantrell, Jr., opened the door for the State to admit photographs of Appellant's tattoos, one of which read "white pride." During his examination of Cantrell, defense counsel inquired as to whether the witness knew of Appellant making any racist statements and whether Appellant had any particular relationships with black persons. The witness testified that he had never heard Appellant make any racist remarks and that while Appellant lived in Louisiana "he rented a trailer and had a black guy and his brother living there." Cantrell said Appellant paid the rent and he knew of no problems between Appellant and the other two men. Counsel closed his examination of the witness by inquiring into Cantrell's knowledge of Appellant's tattoos and whether there were any that were "offensive as far as race is involved." The witness responded in the negative. When asked on cross-examination about the "white pride" tattoo, the witness said he had never seen that tattoo on Appellant.

¶ 106 Here, counsel did present evidence that Appellant was not a racist. That counsel could have done more is insufficient to warrant a finding of ineffectiveness. As for the tattoo, absent a showing of incompetence, an appellant is bound by the decisions of his counsel and mistakes in tactic and trial strategy do not provide grounds for subsequent attack. *See Davis v. State,* 759 P.2d 1033, 1036 (Okl.Cr.1988). To the best of counsel's knowledge, the witness did not know about the "white pride" tattoo, therefore counsel's inquiry does not render him ineffective. Effective assistance of counsel does not mean that a defendant is entitled to flawless or victorious counsel. *Rushing v. State,* 676 P.2d 842, 856 (Okl.Cr.1984).

¶ 107 Filed with the direct appeal was an Application for Evidentiary Hearing on Sixth Amendment Claim and Motion to Supplement, pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (1998). Appellant asserts in the Application that counsel was ineffective in failing to investigate and present evidence to rebut the State's allegations that Appellant was a racist and the murder of the victim was a racial killing. Attached to the Application are thirteen (13) affidavits. Six (6) of the affidavits are from friends or relatives of Appellant who state they are black persons and never knew Appellant to

be a racist, and that he defended them during instances when others used racial slurs toward them. The remaining affidavits are from former employers and co-workers who also stated they had never known Appellant to be a racist. One affidavit is from a Dr. Richard Rettig, Ph.D., in sociology, who would testify to the inmate subculture in prison settings, and that Appellant's tattoo was acquired in such a setting and only in response to pressure from other inmates. Appellant's Application contended these items constituted the "clear and convincing evidence" necessary under Rule 3.11(B)(3)(b)(i) to demonstrate a strong possibility trial counsel was ineffective.

¶ 108 After thoroughly reviewing Appellant's application, we found it set forth "clear and convincing evidence" necessary under Rule 3.11(B)(3)(b)(i) to demonstrate a strong possibility trial counsel was ineffective, therefore an evidentiary hearing was ordered. Such a hearing was held in the District Court of Bryan County. In accordance with this Court's request, the trial court's written findings of fact and conclusions of law along with transcripts of the hearing were filed in this Court. Under Rule 3.11, the findings of fact and conclusions of law were to determine: 1) the availability of the evidence or witness, the effect of the evidence or witness on the trial court proceedings; 2) whether the failure to use a witness or item of evidence was trial strategy; and 3) if the evidence or witness was cumulative or would have impacted the verdict rendered.

¶ 109 The District Court stated in its findings of fact and conclusions of law, that it took testimony from four (4) witnesses and considered the stipulated evidence from seven (7) witnesses whose affidavits had accompanied the application for evidentiary hearing. Briefly, the trial court made the following findings: 1) a determination could not be made whether trial counsel knew or should have known of the testimony of the stipulated witnesses, that no evidence was presented that trial counsel should have known of the testimony of witnesses Geraldine Spikes, Rhonda Spikes and Sharon Culligan, and that counsel knew of the existence of Dr. Richard Rettig and of his ability to testify to sociology matters; 2) each of the witnesses whose testimony was offered at the evidentiary hearing or by stipulation was available at the time of trial, except for Dr. Richard Rettig; that Dr. Rettig was physically unavailable to testify at trial; 3) all previously stated witnesses, except Dr. Rettig, would have testified to the information set forth in the affidavits affixed to the application for evidentiary hearing; 4) the evidence that Appellant was not a racist and held no acrimony for black people would have no effect on the trial proceedings during second stage had it been presented; and 5) no testimony was offered as to why trial counsel did not call the witnesses listed in the application for evidentiary hearing; however the decision not to call those witnesses could have reasonably been based upon legitimate trial strategy.

¶ 110 In a Supplemental Brief on Remanded Evidentiary Hearing, Appellant raises three propositions of error: 1) the District Court's finding of fact and conclusions of law are not supported by the record; 2) Appellant was denied an opportunity to present his defense that the death of the victim was not racially motivated and that he was not a racist in order to rebut the State's theory of the case; and 3) the evidence presented at the evidentiary hearing established that trial defense counsel was ineffective for failing to investigate and present relevant evidence that Appellant was not a racist and that the crime was not racially motivated.

¶ 111 Turning to the first proposition, Appellant contends that both parties were ordered to prepare and submit to the District Court proposed findings of fact and conclusions of law setting forth the facts established at the evidentiary hearing and the conclusions warranted by those facts. Appellant asserts his proposed findings of fact and conclusions of law were completely ignored by the District Court, that the trial court merely adopted the prosecution's proposed findings of fact and conclusions of law and therefore abdicated its responsibility to act as a neutral and unbiased factfinder.

¶ 112 As an example of the trial court's deference to the prosecution's position, Appellant directs us to the findings regarding

witness Geraldine Spikes. In the findings of fact and conclusions of law, the trial court found the testimony of Geraldine Spikes established that Ms. Spikes had contacted Appellant while in jail, prior to his trial, but she did not contact defense counsel and advise him of any testimony she might be able to offer. The court further found there was no evidence presented at the evidentiary hearing to establish that trial counsel knew of Ms. Spikes or that counsel should have known of Ms. Spikes and any testimony she might have that would be relevant.

¶ 113 A review of the evidentiary hearing transcript shows Ms. Spikes testified that Appellant was her son's brother-in-law. She stated that while Appellant was in jail, prior to his trial, she called him once a month. She said she was not contacted at the time of trial, but would have testified had she been so contacted. On cross-examination by the State, Ms. Spikes said she never contacted Appellant's attorney, that her contact was solely with Appellant.

¶ 114 The trial court's findings of fact concerning Ms. Spikes were properly based on the record. Further, the trial court's conclusion of law was proper under case law from this Court. In *Roberts v. State*, 910 P.2d 1071, 1081 (Okl.Cr.1996) this Court held:

> We likewise hold Petitioner cannot show prejudice by counsel's perceived failure to more thoroughly investigate his case. Counsel presented a viable defense, and there is nothing to indicate any additional evidence counsel could have obtained would have changed the outcome of the trial or the determination of punishment. Concerning mitigating evidence, counsel cannot be ineffective for failing to more fully develop Petitioner's life history, as Petitioner has not shown he presented such information to his attorney. Courts have historically held a defendant bears some burden of supplying counsel with necessary information within his knowledge. (internal citations omitted).

¶ 115 In the present case, no evidence was introduced at the evidentiary hearing that Appellant in any way informed trial counsel about Ms. Spikes or that trial

counsel in any way knew of Ms. Spikes. We find the trial court did not abuse its discretion in concluding that no evidence was presented establishing that trial counsel should have known that Appellant's brother-in-law's mother had any relevant testimony to offer at trial. That this conclusion was also reached by the prosecution in its argument at the evidentiary hearing does not show that the trial court abdicated its responsibility as a neutral factfinder. The findings of fact and conclusions of law as they pertain to Ms. Spikes were properly based on the record and applicable law.

¶ 116 We have reviewed the remainder of the trial court's findings of fact and conclusions of law and find they are also based upon the evidence presented at the evidentiary hearing and the applicable state law. Appellant's claim that the trial court merely parroted the proposed findings of fact and conclusions of law as prepared by the State is unfounded.

¶ 117 Appellant also challenges the trial court's finding regarding the absence of additional second stage testimony to the effect that Appellant was not a racist. The trial court stated:

> This Court finds not only that trial counsel's decision not to call additional witnesses at trial in the same vein as Roy Cantrell was objectively reasonable trial strategy, but that such appeared to be the most prudent course available after seeing the total lack of constructive effect achieved by Cantrell's testimony. (Findings of Fact and Conclusions of Law, pg. 5).

¶ 118 Appellant argues this finding "completely disregards Appellant's argument that trial defense counsel was ineffective for broaching the subject with Cantrell without being fully prepared to present the available favorable evidence." (Appellant's supplemental brief, pg. 4).

¶ 119 The issue of Appellant's racial tolerance was not raised by the defense until the second stage of trial. Testimony and stipulated evidence at the evidentiary hearing from Appellant's family members and friends indicated their doubts that Ap-

pellant committed the murder and that he used racial slurs. As these two facts had been proven beyond a reasonable doubt in the first stage of trial, the weight of any testimony concerning Appellant's prior racial tolerance is questionable. We will not second guess trial counsel's decision to open the door to the racial tolerance issue with Mr. Cantrell, considering Cantrell's apparent lack of knowledge about the tattoo. However, reviewing the record in its entirety, it is clear that counsel could have asked as many witnesses as he could produce whether they thought Appellant was a racist and it would not have made any difference in light of the evidence of Appellant's own actions and words at the time of the murder. That evidence, upon which the jury found Appellant guilty, showed he killed an unarmed young black man while spewing racist obscenities, both before and after the stabbing. Presenting the opinion testimony of witnesses who, in the first place, did not agree with the jury's determination of guilt, would not have mitigated the evidence offered in support of the aggravating circumstances. Whether or not Appellant was a racist, he was found guilty on the evidence presented by the State. It was reasonable trial strategy for counsel not to spend the time on a defense which would have no impact.

¶ 120 In the second proposition of the supplemental brief, Appellant challenges the trial court's finding that evidence of Appellant's racial tolerance was solely a second stage issue. Appellant argued at trial and at the evidentiary hearing that evidence of his racial tolerance was relevant to proving the victim's death was not racially motivated.

■ ¶ 121 The prosecution's case against Appellant was based upon Appellant's own actions and words at the time of the offense. The label of a "racial killing" was put on the case by Appellant, not by the State. Appellant's personal beliefs on the issue of racial tolerance would not make it more or less probable that he possessed the necessary malice aforethought for first degree murder. See 12 O.S.1991, § 2401. Therefore, the trial court properly limited evidence of Appellant's personal beliefs to second stage.

¶ 122 Finally, Appellant contends the evidence presented at the evidentiary hearing established that trial counsel was ineffective for failing to present evidence of Appellant's racial tolerance and that the trial court's finding to the contrary was error. In the transcript of the evidentiary hearing, Appellant's mother, sister, and brother-in-law's mother testified they had never known Appellant to be a racist or to hold any acrimony for black people. The stipulated evidence from friends and co-workers also said the same. The trial court's findings of fact accurately reflected this evidence.

¶ 123 However, the trial court's conclusions as to the issue of ineffectiveness were not to be based solely upon counting up the number of witnesses who testified in the same manner. The trial court was to determine if the evidence was cumulative or if it would have had an impact on the verdict. See Rule 3.11(B)(3)(b)(iii). Here, the trial court found that in light of Mr. Cantrell's testimony, further testimony by Appellant's family and friends was cumulative. As an appellate court, this Court will not evaluate the effectiveness as to the number of witnesses who testify to the same evidence. Further, the trial court found the evidence offered by the defense was not relevant as it did not controvert either of the aggravating circumstances alleged by the State. We agree and find Appellant's personal beliefs of racial tolerance did not mitigate the evidence that the murder was heinous, atrocious or cruel nor was it relevant to a determination of Appellant's future dangerousness.

¶ 124 Under Rule 3.11(B)(3)(b)(iv) the findings of fact and conclusions of law of the trial court shall be given strong deference by this Court in determining the proposition raised by appellate counsel; however, this Court shall determine the ultimate issue whether trial counsel was ineffective. Here, we have thoroughly reviewed the record, which includes trial proceedings as well as the evidentiary hearing, and Appellant's allegations of ineffectiveness, in order to determine whether Appellant was denied effective assistance of counsel. We have considered counsel's challenged conduct on the facts of the case as viewed at the time and have

asked if the conduct was professionally unreasonable and, if so, whether the error affected the jury's judgment. *Le v. State,* 947 P.2d 535, 556 (Okl.Cr.1997), *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998).

¶ 125 Based on the record presented, we find that counsel only called one witness during second stage to testify to Appellant's racial tolerance. Several other witnesses would have testified to the same if asked. In fact, two of the witnesses called at the Rule 3.11 evidentiary hearing testified during the second stage of Appellant's trial. Any omission by counsel in failing to call additional witnesses was reasonable trial strategy within the wide range of professionally competent assistance. In *Boltz v. State,* 806 P.2d 1117, 1126 (Okl.Cr.1991), *cert. denied,* 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1992), we quoted *United States v. Glick,* 710 F.2d 639, 644 (10th.Cir.1983), *cert. denied* 465 U.S. 1005, 104 S.Ct. 995, 79 L.Ed.2d 229 (1984):

> "[A]n attorney who makes a strategic choice to channel his investigation into fewer than all plausible lines of defense upon which he bases his strategy are reasonable and his choices on the basis of those assumptions are reasonable ...," An attorney's decision not to interview witnesses and to rely on other sources of information, if made in the exercise of professional judgment, is not ineffective counsel.

¶ 126 The record in this case clearly shows trial counsel made a strategic choice to present a defense based upon the theory that Appellant suffered from post-traumatic stress syndrome as a result of an abusive childhood, and in particular his relationship with an abusive father. In addition to testimony from family members establishing the abusive environment in which Appellant was raised, counsel presented testimony from three (3) experts concerning the impact of that upbringing on Appellant. These experts testified that as a result of his abusive childhood, Appellant suffered from various types of mental disabilities and/or disorders which could erupt at times when the reaction was not related to the current event, but to past events. Counsel attempted to show the jury

that Appellant did not possess the premeditated intent to kill the victim, that he was upset and concerned that his father was going to abuse his (Appellant's) daughter just as he had abused Appellant, and that he reacted inappropriately to what he perceived were taunts directed at him by the group of teenagers at the convenience store. Based upon the facts of the stabbing in this case, to choose this type of defense, instead of arguing that Appellant did not intend to kill because he held no acrimony for black people, was reasonable trial strategy.

¶ 127 In reviewing counsel's conduct we are guided by the admonition set forth in *Burger v. Kemp,* 483 U.S. 776, 788, 107 S.Ct. 3114, 3123, 97 L.Ed.2d 638 (1987):

> 'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac,* 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.' *Strickland v. Washington,* 466 U.S., at 689, 104 S.Ct., at 2065.

¶ 128 When the record indicates counsel deliberately chose a certain strategy upon which to defend his or her client, we will not second guess that strategy on appeal. *See Frederick v. State,* 667 P.2d 988, 992 (Okl.Cr. 1983). Tactical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance. *U.S. v. Ortiz Oliveras,* 717 F.2d 1, 3 (1st Cir.1983). At the conclusion of most trials, the non-prevailing party will always wish they had called more or different witnesses, or used a different strategy. However, that is not the test of effective assistance of counsel. In determining whether counsel's conduct was outside the wide

range of professionally competent assistance, we consider whether counsel fulfilled the function of making the adversarial testing process work. *Le*, 947 P.2d at 556.

¶ 129 Here, counsel presented a viable defense and thus fulfilled the function of making the adversarial testing process work. As our ultimate focus must be on the fundamental fairness of the trial, we find that Appellant has failed to rebut the strong presumption that counsel's conduct was professionally reasonable and that he has failed to show that he was denied a fundamentally fair trial. Accordingly, this assignment of error is denied.

### ACCUMULATION OF ERROR CLAIM

¶ 130 In his twenty-first assignment of error, Appellant contends the aggregate impact of the errors in this case warrants reversal of his convictions and at the very least modification of his death sentence. This Court has repeatedly held that a cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Ashinsky v. State*, 780 P.2d 201, 209 (Okl.Cr.1989); *Weeks v. State*, 745 P.2d 1194, 1196 (Okl.Cr.1987). However, when there have been numerous irregularities during the course of a trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors was to deny the defendant a fair trial. *Bechtel v. State*, 738 P.2d 559, 561 (Okl.Cr.1987).

¶ 131 Looking at both stages of trial, separately, we find certain errors did occur. However, when such errors are considered singularly and collectively, they were not so egregious or numerous as to have denied Appellant a fair trial. Therefore, no new trial or modification of sentence is warranted and this assignment of error is denied.

### MANDATORY SENTENCE REVIEW

¶ 132 In his twelfth assignment of error, Appellant argues the death sentence cannot withstand our mandatory sentence review. Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. Turning to the second portion of this mandate, the jury found the existence of two (2) aggravating circumstances: 1) the murder was especially heinous, atrocious, or cruel; and 2) there was an existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1991, § 701.12(4)(7). As discussed above each of these aggravators was supported by sufficient evidence.

¶ 133 Having found the aggravators supported by sufficient evidence, we turn to the mitigating evidence. Appellant presented seventeen (17) witnesses ranging from family members, neighbors, and friends to a social worker, a clinical psychologist and a psychiatrist. These witnesses testified that Appellant did not have a history of violent criminal conduct; at the time of the offense he was acting out of anger towards his father and because of an abusive childhood; his capacity to appreciate the criminality of his conduct or to conform to his conduct to the requirements of law was impaired; he was under the influence of alcohol; he was under the influence of mental/emotional disturbance; his age and emotional and family history. This evidence was summarized into fourteen (14) factors and submitted to the jury for their consideration as mitigating evidence, as well as any other circumstances the jury might find existing or mitigating. (O.R.621).

¶ 134 Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate. Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.1991, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, finding no error warranting reversal or modification, the JUDGMENT and SENTENCE is AFFIRMED.

JOHNSON, J., and LILE, J., concur.

STRUBHAR, P.J., concurs in results.

CHAPEL, J., concurs in part/dissents in part.

CHAPEL, Judge, concurs in part/dissents in part.

¶ 1 I concur in affirming the conviction in this case. However, I dissent to the decision to affirm the death sentence.

¶ 2 The aggravating circumstance of "especially heinous, atrocious, or cruel" is only applicable to those cases in which the murder was preceded by torture or serious physical abuse. *Cudjo v. State*, 925 P.2d 895, 901 (Okl.Cr.1996), *cert. denied*, 519 U.S. 1126, 117 S.Ct. 981, 136 L.Ed.2d 863 (1997). Here, while the victim was aware of his injury and survived, consciously, for a brief period of time before dying, there is no evidence the murder was preceded by torture or serious physical abuse or that the victim experienced conscious physical or mental suffering prior to his death. "While [the victim's] murder was senseless and tragic, the manner of [the] killing did not involve any acts of injury or cruelty beyond the scope of the act of killing itself." *Id.* at 901–02.

¶ 3 The other aggravator found in this case was that of "continuing threat." "To support the aggravator of continuing threat, the State must present evidence showing the defendant's behavior demonstrated a threat to society and a probability that threat would continue to exist in the future." *Hain v. State*, 919 P.2d 1130, 1147 (Okl.Cr.1996), *cert. denied*, 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996). A defendant's criminal history, the callousness of the crime, threats against others, lack of remorse, and attempts to prevent calls to the police are all factors this Court has previously considered when addressing this issue. *Cudjo*, 925 P.2d at 902.

¶ 4 Appellant's criminal history does not support this aggravator. Although prior convictions for second degree burglary, possession of stolen vehicle and escape from a penal institution were admitted in support of the aggravator, this evidence is not probative of the aggravator. "[E]vidence of prior criminal acts must 'focus on only those crimes which indicate the likelihood of future vio-

lence.' " *Torres v. State*, 962 P.2d 3, 23, *cert. denied*, —— U.S. ——, 119 S.Ct. 826, 142 L.Ed.2d 683 (1999). *See also Cudjo*, 925 P.2d at 902 (wherein this Court found evidence of non-violent offenses was not probative of the "continuing threat" aggravator). Evidence that while in jail Appellant filled a spray bottle with urine and sprayed it on guards who were serving his food is the only act by Appellant that could be characterized as a violent act. However, in the absence of any evidence of prior criminal acts of violence or evidence of violent criminal activity occurring after the crime, the State failed to establish a pattern of criminal conduct by Appellant that will likely continue in the future based on the specific facts in this record.

¶ 5 Further, while the facts of this case illustrate a senseless murder and the absence of any remorse by Appellant, the murder itself was not committed in a particularly brutal or calloused manner. *See Cudjo*, 925 P.2d at 902; *Snow v. State*, 876 P.2d 291, 298 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995). There is no evidence Appellant sought out his victim or engaged in any calculated planning to kill McFail in order to support a finding that the murder was committed in a particularly brutal or calloused manner. *Malone v. State*, 876 P.2d 707, 718 (Okl.Cr.1994). Accordingly, the evidence is insufficient to support the finding that appellant constitutes a continuing threat to society, and this aggravator fails. As only two aggravators were found by the jury and neither is supported by sufficient evidence, the death penalty in this case should be vacated.

¶ 6 Since both aggravators fail for insufficient evidence, I would modify the sentence to life without parole. Moreover, the majority opinion glosses over serious issues raised concerning ineffectiveness of counsel claims. In my judgment, even if the aggravators could be upheld, this case should be reversed and remanded for a new sentencing hearing.